Order of the special term affirmed.

[NEW-YORK GENERAL TERM, May 1, 1854. *Mitchell*, *Roosevelt* and *Clerke*, Justices.]

---

## THOMAS vs. BRACKNEY.

A person owning an upper mill or factory, on a stream of water, has a right to use the water, and may apply it to the propelling of his mill or factory, subject to such reasonable limitations as the rights of mill owners lower down the stream require him to observe.

If by an unreasonable use of the water the mills below are essentially impaired in their usefulness, the law will interpose, and limit the common right, so that the owners of the lower mills shall enjoy a fair participation in the use of the stream.

Thus where the defendant, owning a tannery, threw large quantities of tanbark into the stream, which floated down into the plaintiff's pond, below, filling his race, and getting into his flume, and injuring his grist mill; *Held*, that the defendant was liable for the damage thus occasioned.

The courts cannot lay down any rule which shall limit the precise boundaries of the respective rights of different owners upon the same stream. Each case must be decided upon its own circumstances; and the question of what is a reasonable use of the water by the mill owner above, depending as it does on the nature and size of the stream, the business to which it is subservient, &c., must be determined by the jury, and not by the court.

THIS action was brought by the plaintiff against the defendant in a justice's court, for an alleged injury to his mill, arising

Thomas *v.* Brackney.

from the defendant throwing tan-bark into the stream, which floated down into the plaintiff's pond, filling his race and getting into his flume, &c. The defendant's tannery was situated on the same stream—the Charlotte creek—with the plaintiff's grist mill, and was about five miles above it. The plaintiff's grist mill was erected in 1824, and the defendant's tannery in 1833. The defendant's tannery had been in operation for seventeen years, and the tan-bark had always been thrown into the stream, and, so far as the evidence showed, no injury had been occasioned to the plaintiff's mill by the tan-bark until about two years before suit; and it appeared from the evidence that there were several other mills and factories within two miles of the defendant's tannery, and one saw mill on the same dam with the plaintiff's mill, and yet, none of these, it would seem, from the evidence in the case, had received damage from the defendant's tan-bark, to injure them. The defendant sought to show that this injury was caused by the accumulation of flood wood, which had lodged in the plaintiff's pond, close to the head of his race, that conducted the water to his mill, and which prevented the tan-bark from going down the stream, and turned it into the race and flume. The justice rendered a judgment for the plaintiff, for the damages alleged, and the defendant appealed to the county court, where the judgment was affirmed, and the defendant appealed to this court.

*R. King*, for the plaintiff.

*S. A. Givens*, for the defendant.

*By the Court*, MASON, J. The maxim, "*Sic utere tuo ut alienum non lædas,*" is as sound in morals, as it is firmly settled in the principles of the common law. The judicial mind, however, is not unfrequently greatly perplexed in applying this maxim to the conflicting rights of men, in the complicated affairs of society. The application of this maxim, to the class of cases to which the one under consideration belongs, is many times difficult in the extreme, arising from the conflicting rights of indi-

viduals, affected as they are, more or less, by considerations affecting the public interests.   By the civil law, running water, light and air, were considered as things common, "*res communes*," and were defined as things, the property of which belongs to no one, but the use to all, and the learned commentator upon the English common law, speaking upon this subject, says: "Water is a movable, wandering thing, and must of necessity continue common by the law of nature; so that I can only have a temporary, transient, usufructuary property therein; wherefore if a body of water move out of my pond into another man's, I have no right to reclaim it." And it was said by the learned Chief Justice Tindal, in *Liggins* v. *Inge*, (7 *Bing. R.* 682, 691,) that it is well settled by the law of England, that flowing water in a stream is *publici juris.*   Chief Justice Denman, however, in the case of *Mason* v. *Hill*, (5 *Barn. & Adolph.* 1,) with his usual learning and ability, has shown that neither by the Roman law or the English common law, is running water considered as a *bonum vacans* in which any one may acquire a property, but as public or common in this sense only, that all may drink it, or apply it to the necessary purposes of supporting life, and that no one has any property in the water itself, except in that particular portion which he may have abstracted from the stream and of which he has the possession, and during the time of such possession only.   And he says, "There is no authority in our laws, nor, as far as we know, in the Roman law, that the first occupant, (though he be the proprietor of the land above,) has any right, by diverting the stream, to deprive the owner of the land below of the special benefit and advantage of the natural flow of water therein."   The law is well settled in England and this country that the owner of lands above, over which a stream of water runs, while he has the right to use the stream for hydraulic purposes, in manufacturing or any of the mechanic arts, has no right to divert the stream from its natural channel, and thereby deprive the owner of the lands below of the natural flow of the stream.   But precisely to what extent the owner above may use the water for manufacturing purposes, not diverting it from its accustomed channel, does not seem to be very well de-

Thomas *v.* Brackney.

fined in the books : in other words, how far the owner above shall be allowed to use the water of the stream for mechanical and manufacturing purposes, where such use may produce injury to the owner below, I do not find very well settled by any of the adjudged cases in England or this country. The courts in this state seem to place very great importance upon the effect which the limiting of the use of the stream, when applied to manufacturing purposes, will have upon the public interests ; and they have in several cases held that the maxim, " *Sic utere tuo ut alienum non lædas,*" must be regarded as somewhat limited, and affected, in its application, to this class of cases, by the public considerations which enter into the subject. It was held in the case of *Palmer* v. *Mulligan et al.*, (3 *Caines' R.* 314,) that when persons have equal rights to erect mill dams on a river, the rubbish of which comes from a newly erected upper mill to an older lower mill, though it be an inconvenience to the lower mill, causing some considerable damage thereto, will not lay the foundation of an action, unless the person above has made an unreasonable use of his privilege above, and it be very clear that the party had no right to use it in that way ; and this, I have no doubt, is the sound rule. The erection of dams, on all streams, is more or less injurious to those who have mills on the same stream below, in the withholding of the water, and by a greater evaporation in consequence of an increased surface, and from the natural results of the effect of manufactories, in the refuse matter which they throw off into the stream. Were the law to regard such inconveniences, and give an action for every trifling damage of this character, there would be an end of all improvement and progress. The man who should first build upon a stream would acquire an exclusive right, at least for miles above him, for it would not·be easy to build above him without producing some injury and detriment to the owner below. In view of this consideration Justice Livingston said, in the case of *Palmer* v. *Mulligan,* " were this not permitted, for fear of some inconsiderable damage to others, the public, whose advantage is always to be regarded, would be deprived of the benefit which always attends competition and rivalry." He adds : "As well, therefore, to secure to individuals

the free and undisturbed enjoyment of their property, as to the public the benefits which most frequently redound to it from such use, the operation of the maxim, " *Sic utere tuo ut alienum non lædas*," should be limited to such cases only, where a *manifest* and *serious damage* is the result of such use or enjoyment; and where it is very clear indeed that the party had no right to use it in that way." (3 *Caines*, 314.) The same doctrine, in principle, is affirmed in the case of *Platt* v. *Johnson*, (15 *John.* 214, 218.) Chief Justice Thompson, in discussing this subject of the use of water in a stream for mill purposes, says, " The maxim, *Sic utere tuo ut alienum non lædas*, must be taken and construed with an eye to the natural rights of all. Although some conflict may be produced in the use and enjoyment of such rights, it cannot be considered in judgment of law an infringement of the right. If it become less useful to one by the enjoyment of another, it is by accident, and because it is dependent on the exercise of the equal rights of others." The application of this principle to cases of this kind, as we have before said, is often perplexing to the judicial mind. I apprehend, however, that a person owning an upper mill or factory on the same stream, has a lawful right to use the water, and may apply it to work his mill or factory, subject to such reasonable limitations as the rights of the mill owner lower down the stream require him to observe. If, by an unreasonable use, the mills down the stream are essentially impaired in their usefulness, the law will in that case interpose and limit this common right; so that the owners of the lower mills shall enjoy a fair participation in the use of the stream, and if thereby the owners of the upper mills sustain a partial loss of business and profit, they cannot complain, for this rule requires of them no more than to conform to the principle upon which their right is founded; and such is the rule in *Merritt* v. *Brinkerhoof*, (17 *John.* 321.) It cannot therefore be admitted that the defendants may use the stream as they please, because they have a right to a common use, although the defendant's business and profits may be greatly promoted by such use. The rights of the plaintiff must be regarded. He must participate in the benefit of the stream to a reasonable extent, although

Thomas *v.* Brackney.

the defendant's profits may be thereby lessened. (17 *John.* 321.) It is impossible for the court to lay down any rule which shall limit the precise boundaries of their respective rights, in all cases; each case will have its own characteristic circumstances, upon the facts of which the case will turn; and it is said, upon very high authority, that the question of the reasonable use of the water by the mill owner above, depending as it must on the nature and size of the stream, as well as the business to which it is subservient, and on the ever varying circumstances of each particular case, must be determined by the jury and not the court. (*Hetrich* v. *Deachler,* 6 *Barr's R.* 32. *Hoyt* v. *Sterill,* 2 *Watts' R.* 332. *Wadsworth* v. *Tillotson,* 15 *Conn. R.* 263.) And their finding must be final, unless the verdict is against evidence. The justice of the peace in this case is substituted in the place of the jury, and the same effect must be given to his finding as we would give to that of a jury. The justice has found that there has been an unreasonable use of the water of this stream by the defendant, in raising it to float off such large quantities of his tan-bark, as the evidence in this case shows was thrown into the stream, from the defendant's tannery; and the county court have affirmed the finding of the justice. It seems to me, therefore, that we cannot with propriety interfere with the judgment of the court below, although I am free to confess that I should have been better satisfied with the judgment if it had been for the defendant; as I am strongly inclined to think that if the plaintiff had removed the flood wood which had collected in his pond, and lodged close to the head of his race, he would not have had this trouble with the defendant's tan-bark; but I do not think that sitting here as an appellate court to review the judgment which another appellate court has approved and sanctioned, and upon a question which, as we have seen, legitimately belongs to the jury, or to the original tribunal in this case, we should be justified in reversing this judgment. The judgment must be affirmed.

[TOMPKINS GENERAL TERM, September 2, 1851. *Mason, Shankland* and *Monson,* Justices.]